1

```
              IN THE UNITED STATES DISTRICT
         FOR THE WESTERN DISTRICT OF TENNESSEE
                    WESTERN DIVISION
```

UNITED STATES OF AMERICA,

     Plaintiff,

vs.          NO. 21-cr-20092-TLP

ROY EDWARDS,

     Defendant.

```
                   MOTION TO SUPPRESS

                      BEFORE THE

                HONORABLE THOMAS L. PARKER


                   September 8, 2021
```

```
         CATHERINE J. PHILLIPS, FAPR, RMR, CMRS
                   OFFICIAL REPORTER
              FOURTH FLOOR FEDERAL BUILDING
                MEMPHIS, TENNESSEE 38103
```

UNREDACTED TRANSCRIPT

1            A P P E A R A N C E S

2

3

4

5        Appearing on behalf of the Plaintiff:

6            NEAL OLDHAM, ESQUIRE
             U.S. Attorney's Office
7            167 N. Main Street, Suite 800
             Memphis, TN 38103
8            901.554.4231
             neal.oldham@usdoj.gov

9

10

11       Appearing on behalf of the Defendant:

         KAFAHNI NKRUMAH, ESQUIRE
12           Federal Public Defender - Memphis
             200 Jefferson Avenue, Suite 200
13           Memphis, TN 38103
             901.544.3895
14           kafahni_nkrumah@fd.org

15

16

17

18

19

20

21

22

23

24

25

                    UNREDACTED TRANSCRIPT

1                           I N D E X

2

3                                                         PAGE

4      PROCEEDINGS                                          4

5      WITNESS:  OFFICER TUBORIS MARTIN
           DIRECT EXAMINATION BY MR. OLDHAM               7
6          CROSS-EXAMINATION BY MR. NKRUMAH              15
           REDIRECT EXAMINATION BY MR. OLDHAM            35
7
       WITNESS:  OFFICER RYAN MENDOZA
8          DIRECT EXAMINATION BY MR. OLDHAM              39
           CROSS-EXAMINATION BY MR. NKRUMAH              52
9
       WITNESS:  OFFICER MARK MARTIN
10         DIRECT EXAMINATION BY MR. OLDHAM              67
           CROSS-EXAMINATION BY MR. NKRUMAH              75
11
       CERTIFICATE                                       95
12

13

14     EXHIBITS                 (DESCRIPTION)            PAGE

15     Collective Exhibit No. 1 (Photo array)            11

16     Collective Exhibit No. 2 (3 photos)               72

17

18

19

20

21

22

23

24

25

4

1                              **Wednesday**

2                          **September 8, 2021**

3

4          The MOTION TO SUPPRESS in this case began on this

5     date, Wednesday, September 8, 2021, at 1:41 p.m., when and

6     where evidence was introduced and proceedings were had as

7     follows:

8

9                          ----------------------

10              THE COURT:  Good afternoon.

11              MR. NKRUMAH:  Good morning, Your Honor.

12              MR. OLDHAM:  Good afternoon.

13              THE COURT:  This is in the matter of the United

14    States versus Roy Edwards.  Mr. Oldham is here on behalf of

15    the United States.  Mr. Edwards is present in the courtroom.

16    Good afternoon.  And Mr. Nkrumah is here with Mr. Edwards.

17              This is a motion to suppress.  It's a motion to

18    suppress evidence in connection with the arrest of

19    Mr. Edwards.  I guess it was in March of 2021.

20              I did receive a copy of the video, which appears,

21    to me, to be video from the store where the arrest took

22    place.  And I've watched that.  So just letting everybody

23    know that I've seen the video.  I know you've got to make

24    your record, but I have looked at it.

25              MR. OLDHAM:  Your Honor, this is Special Agent

                          UNREDACTED TRANSCRIPT

```
 1   Phil Singer of the ATF.  Do you mind if he sits at counsel
 2   table?
 3                THE COURT:  No, not at all.
 4                MR. OLDHAM:  Thank you, Judge.
 5                THE COURT:  Sure.
 6                So I have reviewed the video.  So I think I
 7   know -- I've read the briefs, obviously.
 8                So, Mr. Nkrumah, are you ready to proceed?
 9                MR. NKRUMAH:  Yes, we are, Your Honor.
10                THE COURT:  Mr. Oldham, are you ready?
11                MR. OLDHAM:  Yes, Your Honor.
12                THE COURT:  All right.  Well, I don't know, do
13   y'all want to be heard with any kind of opening statement or
14   anything, or do you want to dive right in?
15                MR. NKRUMAH:  Diving right in is fine.
16                MR. OLDHAM:  I agree, Your Honor, just calling
17   the witnesses, if you don't mind.
18                THE COURT:  That's fine.
19                MR. OLDHAM:  Government calls Sergeant Martin,
20   Your Honor.
21           (Whereupon, Sgt. Tuboris Martin duly sworn.)
22                THE WITNESS:  I do.
23                CASE MANAGER:  Please take the witness chair.
24                THE COURT:  You need batteries?
25                We're going to get the microphone squared away.
```

6

1    We'll be right with you.  Whenever we need them, the

2    batteries are always dead.  You need batteries?

3              CASE MANAGER:  Yes, all of them need it.

4              THE COURT:  Whatever you were working with right

5    there sounded like it was working.

6              CASE MANAGER:  It's going to go off.

7              THE COURT:  Okay.  We'll try it.

8              Sorry, Mr. Oldham, but we're ready to roll now,

9    at least temporarily.  So why don't you give it a try.

10             MR. OLDHAM:  Okay.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         *   *   *

2                    OFFICER TUBORIS MARTIN,

3   was called as a witness and having first been duly sworn

4   testified as follows:

5                         DIRECT EXAMINATION

6   BY MR. OLDHAM:

7   Q.     Good afternoon.  Would you state and spell --

8               THE COURT:  Can you use the mic -- I'm sorry.  Do

9   you mind standing there.  There you go.

10  BY MR. OLDHAM:

11  Q.     Would you state and spell your first and last name

12  please.

13  A.     Tuboris Martin.  T-U-B-O-R-I-S, M-A-R-T-I-N.

14  Q.     Where are you employed?

15  A.     With the Memphis Police Department.

16  Q.     Where specifically do you report and what are your

17  duties?

18  A.     Austin Peay GIB.  I'm a case investigator.

19  Q.     And what rank do you have?

20  A.     Sergeant.

21  Q.     Were you employed at the Austin Peay GIB -- that's

22  General Investigation Bureau; is that correct?

23  A.     Yes, sir.

24  Q.     -- on March 18th, 2021?

25  A.     Yes.

1    Q.      Were you an investigator there at that time?

2    A.      Yes.

3    Q.      What sort of crimes did you investigate at that time?

4    A.      Violent crimes.

5    Q.      Were you called to investigate an occurrence that

6    happened on the 3067 Sunrise?

7    A.      Yes.

8    Q.      And what was the nature of that occurrence?

9    A.      We got an individual was shot.

10   Q.      And did they -- were they at Sunrise, or had they gone

11   somewhere else?

12   A.      By time we got the call, they were en route to

13   Regional One.

14   Q.      And did you go to Regional One to speak to that

15   person?

16   A.      Yes.

17   Q.      Who did you find there?

18   A.      I found a victim, one gunshot wound.  I can't recall

19   his name.

20   Q.      Where was the wound?

21   A.      I believe it was to his hand or arm area.

22   Q.      And were you able to speak with that victim at that

23   time?

24   A.      Yes.

25   Q.      And was he able to tell you who shot him?

*TESTIMONY OF OFFICER TUBORIS MARTIN*                         9

1   A.      Yes.

2   Q.      And who did he tell you shot him?

3   A.      Immediately he said Roy Edwards, also known as Dirty

4   Shirt.

5   Q.      What did you do with that information?

6   A.      At that point, once we realized he was going to be

7   okay, we went back to the precinct to develop a photo lineup

8   to bring it back to him at Regional One to let him identify

9   the suspect.

10  Q.      Was he there at Regional One?

11  A.      No, they had just let him go.

12  Q.      And did you find him the same day?

13  A.      Yes.  Within minutes.

14  Q.      And was that at his place of -- or his residence?

15  A.      Yes, sir.  He had just pulled up.

16  Q.      Okay.  If this call came in around 1:30, is this on

17  the same day or the next day that you're doing this photo

18  array?

19  A.      Same day.

20  Q.      Just a matter of hours after it occurred; is that

21  correct?

22  A.      Not even that.  Probably within 30 to 40 minutes.

23              THE COURT:  Now, you say 1:30.  Is that 1:30 p.m.

24  or a.m.?

25  BY MR. OLDHAM:

1   Q.      1:30 in the afternoon?

2   A.      P.M.

3              THE COURT:  Thank you.

4   BY MR. OLDHAM:

5   Q.      So around 3:55 p.m., were you able to find the victim

6   again and show him a photo array?

7   A.      Yes.

8   Q.      Okay.

9              MR. OLDHAM:  Your Honor, may I approach please?

10             THE COURT:  Yes, sir.

11  BY MR. OLDHAM:

12  Q.      Do you recognize that, Officer?

13  A.      Yes.

14  Q.      And the next page, do you recognize that?

15  A.      Yes.

16  Q.      And is that the photo array you're referring to that

17  goes along with this case?

18  A.      Yes.

19  Q.      And is that the photo array that you relied on to say

20  who shot this person?

21  A.      Yes.

22             MR. OLDHAM:  Your Honor, can I make that

23  collectively the first numbered exhibit to this hearing?

24             THE COURT:  Any objection?

25             MR. NKRUMAH:  No objection, Your Honor.  I've

 1   seen the photo array.

 2               THE COURT:  Without objection, these two

 3   documents will be admitted as Collective Exhibit Number 1.

 4        (Collective Exhibit No. 1 admitted into evidence.)

 5               MR. OLDHAM:  May I publish it, Your Honor?

 6               THE COURT:  Yes, sir.

 7   BY MR. OLDHAM:

 8   Q.     All right.  Officer, can you see up here on the

 9   screen?

10   A.     Yes.

11   Q.     And is this what we were just talking about?

12   A.     Yes.

13   Q.     And who made this photo array?

14   A.     I did.

15   Q.     Okay.  And what information did you use to make the

16   photo array?

17   A.     Pulled up -- once we got the name of Roy Edwards, we

18   put it in the system.  And that's when we came up with Roy

19   Edwards and date of birth.

20   Q.     Okay.  And here, who circled that face on the picture?

21   A.     The victim did.

22   Q.     And who initialled up there?

23   A.     The victim.

24   Q.     And this thing here, does that help you remember who

25   the victim was?

1  A.      Yes, sir.  Joe Brittman.

2  Q.      All right.  And who wrote:  He shot me, this Roy

3  Edwards, Dirty Shirt?

4  A.      Mr. -- Victim Brittman.

5  Q.      Okay.  And he would have done this the same day he was

6  shot; is that correct?

7  A.      Yes, sir.

8  Q.      When you show somebody a photo array, what do you say

9  to them?

10  A.      We have a form called an Advice of Rights.  It

11  explains the photo lineup to them.  They read it, then they

12  initial off on it.  And then they take a look at the photo

13  lineup.  Then once they review the photo lineup, if they make

14  a correct -- whether they make a correct identification or

15  not, they go back to it and sign off on the second part of

16  it.

17  Q.      Okay.

18  A.      And the number that they saw the individual in.

19  Q.      Did you follow that procedure in this case?

20  A.      Yes, sir.

21  Q.      And this second page, what is this?

22  A.      That's just for our file, our information page on the

23  suspect.

24  Q.      Okay.  And, again, who is this?

25  A.      That's the suspect, Roy Edwards.

1    Q.      Okay.  Once Mr. Brittman was able to circle that

2    person, what did you do with that information?

3    A.      At that point, we went back to the precinct, worked on

4    possible charges, talked -- conferred with our District

5    Attorney, Ms. Lora Fowler, and she told us the appropriate

6    charges.

7            And we decided we were going to wait and notify our

8    task force and see if they could pick him up first, before we

9    swore out a warrant on him.

10   Q.      And what did he have charges for?

11   A.      If I remember, criminal attempt, second-degree murder.

12   Q.      In Tennessee, could you have also drawn charges for

13   aggravated assault?

14   A.      Yes.

15   Q.      What did you do with that information the next day?

16   A.      The next day, we passed it on to our task force, gave

17   them the information.  They were familiar with this suspect.

18   Q.      Are you person that goes out and finds him, or do you

19   usually ask your task force to accomplish that?

20   A.      We ask the task force to do it.  Request for them to

21   do it.

22   Q.      And were you -- when were you going to actually draw

23   up the documents?

24   A.      I was going to give them, let me see, at least 24 to

25   48 hours.

1  Q.      To try to find Mr. Edwards?

2  A.      Yes, sir.

3  Q.      Was Mr. Edwards found?

4  A.      Yes.

5  Q.      Did you ever speak to him?

6  A.      No.

7  Q.      Who drew up the documents for his arrest?

8  A.      The investigators that were on duty at the time.

9  Q.      So this would have happened after you were home or

10 when you were off?

11 A.      Right after we had left for the day.  A couple of them

12 had stayed behind.

13 Q.      Would they have used your reports to accomplish that?

14 A.      Yes.

15 Q.      To your knowledge or to your mind, on March 18th,

16 after the victim, Mr. Brittman, had circled that picture, if

17 you saw Roy Edwards on the street, what would you have done?

18 A.      I would have approached him with caution; depending on

19 the situation, asked for back up; and proceed to try to place

20 him in custody.

21 Q.      For what?

22 A.      Criminal attempt, second-degree murder.

23 Q.      Did this -- well, were you able to go out to the

24 location of the shooting?

25 A.      After we came back -- after we spoke with

1  Mr. Brittman, we went back to the scene just to walk around,

2  see if we could find any cameras, any additional cameras or

3  anything else that might have gotten missed during the

4  initial officers making the scene.

5  Q.      Were you able to find anything additional?

6  A.      At that time, no.

7  Q.      Were the officers who canvassed the area, were there

8  any witnesses they were able to speak with?

9  A.      I don't think so, no, sir.

10 Q.      Did speaking with the victim and him saying who shot

11 him, did that conclude your investigation?

12 A.      Until we got Mr. Edwards in custody, yes, sir.

13              MR. OLDHAM:  Your Honor, I have no further

14 questions.

15              Thank you for answering my questions.  Please

16 answer Mr. Nkrumah's questions.

17              Pass the witness, Your Honor.

18              THE COURT:  All right.

19              MR. NKRUMAH:  Your Honor, can I have one moment?

20              THE COURT:  Yes, sir.

21              MR. NKRUMAH:  Thank you, sir.

22                      (Short pause.)

23                      CROSS-EXAMINATION

24 BY MR. NKRUMAH:

25 Q.      Good afternoon --

*TESTIMONY OF OFFICER TUBORIS MARTIN*                    16

1              MR. NKRUMAH:  Your Honor, may I?

2              THE COURT:  Yes, sir.

3              MR. NKRUMAH:  Thank you.

4    BY MR. NKRUMAH:

5    Q.     Good afternoon, Sergeant Martin.  Correct?

6    A.     Good afternoon, sir.  Yes, sir.

7    Q.     My name is Kafahni Nkrumah and I'm the attorney for

8    Mr. Roy Edwards who's sitting at defense table.

9    A.     Yes, sir.

10   Q.     I'm going to ask you some questions regarding your

11   investigation of the alleged shooting that Mr. Edwards was

12   accused of committing March 18th, 2021.  Understand?

13   A.     Yes, sir.

14              THE COURT:  Mr. Nkrumah, can I ask you to aim

15   that mic a little closer.  There you go.  Thank you.

16   BY MR. NKRUMAH:

17   Q.     Sergeant Martin, if I ask you a question that you

18   don't understand, will you stop me and let me know that you

19   did not understand the question so I can ask it again?

20   A.     Yes, sir.

21   Q.     Can we assume if you answer the question I asked, that

22   you understood the question that I asked in order to answer

23   it?  If I ask you a question and you answer, can we assume

24   that you understood the question?

25   A.     Yes.

                    UNREDACTED TRANSCRIPT

1   Q.      All right.   Thank you.

2           You stated that you were contacted on March 18th of

3   '21; correct?

4   A.      Yes.

5   Q.      And that was in regards to an aggravated assault?

6   A.      Yes.

7   Q.      Okay.   Where were you when you were first notified of

8   this?

9   A.      I was at our precinct, in our office.

10  Q.      And how were you notified?

11  A.      Through a lieutenant.

12  Q.      And was that notification through 911 or through

13  the -- or by the hospital?

14  A.      It was notified -- we were notified through the

15  lieutenant that made the scene, once the officers made the

16  scene.

17  Q.      Okay.   And do you know if they were notified by a 911

18  call or --

19  A.      I believe it was 911.

20  Q.      Okay.   Have you had an opportunity to listen to that

21  call?

22  A.      No, sir.

23  Q.      And you stated that you didn't respond to the scene;

24  correct?

25  A.      No, sir.

1    Q.       And that's because when you were notified, you were

2    also told that the alleged victim was on the way to the

3    hospital; correct?

4    A.       Yes, sir.

5    Q.       And that hospital was Regional One?

6    A.       Yes.

7    Q.       And you went straight to the hospital?

8    A.       I did.

9    Q.       And when you got to the hospital, how long were you in

10   the hospital before you actually met with the victim, alleged

11   victim?

12   A.       Probably -- he was in a bed, so probably two or three

13   minutes after getting there.

14   Q.       Okay.  Now, you stated that he was in a bed.  Was he

15   in a room by himself?

16   A.       No, he was in the general trauma area.

17   Q.       General trauma area.  And the area was fenced off by

18   curtains, I guess?

19   A.       Yes, sir.

20   Q.       And his section was fenced off just by curtains;

21   correct?

22   A.       Yes, sir.

23   Q.       To the left and to the right were other patients;

24   correct?

25   A.       I believe so.

1  Q.      Okay.  And you stated that when you got to the

2  hospital, he was in the bed.  Was he being treated at that

3  time?

4  A.      They were working on him, working on his injury.

5  Q.      So the doctors and the nurses were in the area working

6  on the alleged victim?

7  A.      Right.  I think they were trying to stop the bleeding

8  or something.

9  Q.      Okay.  Now, at what point did you begin speaking to

10  Mr. Brittman?

11  A.      As soon as we walked over there.  Because he was

12  sitting up and he was able to talk.

13  Q.      Okay.  And who was with you when you went to speak

14  with Mr. Brittman?

15  A.      Detective Coffer.

16  Q.      You two were the only officers there?

17  A.      Yes.  There might have been a reporting officer, he

18  might have been in the hallway.  I can't remember that part

19  of it.

20  Q.      But you and Detective -- you said it was --

21  A.      Coffer.

22  Q.      Hover?

23  A.      Coffer.

24  Q.      Coffer.  You and Detective Coffer were actually in the

25  area that Mr. Brittman was in; correct?

1   A.      Yes.

2   Q.      And it was you and Detective Coffer who were

3   questioning Mr. Brittman; correct?

4   A.      Yes.

5   Q.      Okay.  Now, when you first started questioning

6   Mr. Brittman, what did you tell him?  What did you say?

7   A.      We approached him, asked him how he was doing, and

8   what happened.

9   Q.      Okay.  And did he respond when you asked him what

10   happened?

11   A.      Yes.

12   Q.      And what did he say?

13   A.      He was like, y'all, y'all don't have to look for him,

14   I know who he was -- who he is.  His name's Roy Edwards, also

15   known as Dirty Shirt.  Y'all know him.  He be around here

16   doing this and doing that.

17           He was very frank, straight to the point.

18   Q.      And in response to what -- were those Mr. Brittman's

19   exact words, if you know?

20   A.      I'd say about 95 percent correct.  I mean, I can't

21   give you all -- every word that he used, but that was pretty

22   much how it was.

23   Q.      That was approximately exactly what he said; correct?

24   A.      Yes, sir.

25   Q.      And in response to Mr. Brittman's statement, what, if

1   anything, did you say?

2   A.      Once he made -- said what he said initially, we slowed

3   him down and went through our process of asking him questions

4   on what happened, what was he doing, and went from there.

5   Q.      And you say you slowed him down and asked him

6   questions of what happened.

7   A.      Right.

8   Q.      What did you ask him?

9   A.      When did it happen, where did it happen, do you know

10  who shot you, why would he shoot at you, where were you at

11  when you were shot, was anybody else with you, where you hit

12  at.

13  Q.      Okay.  We are going to break that down question by

14  question.  Okay?

15  A.      Okay.

16  Q.      Now, you stated that you asked him when it happened;

17  correct?

18  A.      Yes, sir.

19  Q.      And what was his response?

20  A.      On Sunrise, the street that he pulled up to.

21  Q.      Did he say anything else?

22  A.      I mean, I can tell you what he was saying.  I mean, I

23  didn't know if you want me to go in the order that you were

24  asking.  So how do you want me to do this?

25  Q.      You said that he responded that it was on Sunrise.

1  A.      Right.

2  Q.      Was he sure about the street?

3  A.      Yes, sir, he was.  Because he said he went over there

4  to someone's house to get his car worked on.  And as he was

5  pulling up, that's when he saw Dirty Shirt walking up to him

6  and just start shooting at him and he pulled off.

7  Q.      And where, again, was this location?

8  A.      On Sun- -- address on Sunrise.  He gave a description

9  of the house.  He said it had a car in the driveway, because

10  they work on -- he needed to get his car worked on.

11  Q.      And you said he gave you a description of the house.

12  What was the description?

13  A.      Can't remember the exact description.  I remember

14  there was a car in the drive -- or in the yard, something

15  like that.  Because we had other investigators as well.  They

16  went to the scene while we went to the hospital.

17  Q.      Okay.  Now, you said you asked him who had shot him;

18  correct?

19  A.      Right.

20  Q.      And what was his response?

21  A.      Roy Edwards, also known as Dirty Shirt.  Every time he

22  said Roy Edwards, he would always repeat, also known as Dirty

23  Shirt.

24  Q.      And you also stated that he ask you -- you asked him

25  why --

1   A.      Right.

2   Q.      -- Mr. Edwards shot at him; correct?

3   A.      Yes, sir.

4   Q.      And what was his response?

5   A.      He doesn't know.

6   Q.      Didn't he respond that they had some type of beef, but

7   he didn't know what the beef was about?

8   A.      He might have.

9   Q.      You stated you asked him if anyone else was with him

10  at the time; correct?

11  A.      Yes, sir.

12  Q.      What was his response?

13  A.      No one else was in the car, it was just him.

14  Q.      And you also asked him where he was hit at; correct?

15  A.      Yes, sir.

16  Q.      And what was his response?

17  A.      If I'm not mistaken, he was saying he got hit in the

18  hand area.

19  Q.      Now, when you were asking these questions, Sergeant,

20  what was Detective Coffer doing?

21  A.      He was standing beside me.

22  Q.      Was he asking any questions?

23  A.      He might have asked one that I forgot to ask, but

24  other than that, no.

25  Q.      Do you remember the question that Detective Coffer

1  asked him?

2  A.      I couldn't tell you, sir.  I can't remember.

3  Q.      Do you know what it was in regards to?

4  A.      I couldn't tell you, sir.  It was all recorded, so I

5  would -- yeah.

6  Q.      Now, you stated it was recorded.  Was it recorded on

7  audio?

8  A.      Video.

9  Q.      Video body cam?

10 A.      Yes, sir.

11 Q.      And you made a body cam recording?

12 A.      Yes, sir.

13 Q.      And how about Detective Coffer?

14 A.      We use the same one.  It was my investigation, so we

15 used mine.

16 Q.      So the only body cam recording at that time was yours;

17 correct?

18 A.      Yes, sir.  I was the primary investigator.

19 Q.      Now, after asking Mr. Brittman these questions, what

20 did you do after that?

21 A.      After we finished with the questions, we called our

22 partners that were on the scene, got a description of what

23 was going on from them.  And we, myself and Detective Coffer,

24 headed to -- back to the precinct to develop the photo

25 lineup.

*TESTIMONY OF OFFICER TUBORIS MARTIN*                     25

1   Q.      Now, when you called your partners on the scene, what

2   was the description that they gave you as to what was

3   occurring at that time?

4   A.      Everything had calmed down.  If I'm not mistaken, a

5   lot of the witnesses had left.  They had knocked on doors.

6   No one was really answering.  And there was a -- they said

7   something about a RTCC camera.

8   Q.      And were you at -- were you able to download the video

9   from that camera?

10  A.      Yes.

11  Q.      Were you able to download it on the day of the

12  incident?

13  A.      Yes, I believe Detective Coffer -- it might have been

14  somebody who was at the precinct later on was able to

15  download it.

16  Q.      Did you have an opportunity to watch that video on the

17  18th?

18  A.      Yes, sir.

19  Q.      And what did the video depict?

20  A.      The video showed Mr. Brittman in a vehicle that he was

21  driving on that day during that incident, pull up, and an

22  individual walked from a yard, that was supposedly the crime

23  scene, walked up and immediately started shooting at the

24  vehicle, and Mr. Brittman pulled off.

25  Q.      You weren't able to tell who that was from the video;

1  correct?

2  A.      It was clear enough to where you could see it was an

3  individual.

4  Q.      But you weren't able to tell who that individual was?

5  A.      Not at that time.  I couldn't look at the video and

6  say, that's him right there, no, sir.

7  Q.      After speaking with your colleagues who were on the

8  scene, what did you do at the hospital next?

9  A.      Like I said, we came back, made a photo lineup.  Went

10  back to Regional One, but Mr. Brittman had got discharged.

11  So we got his address and met him at the house just as he was

12  pulling back up.  We had just missed him by a few minutes.

13  Q.      So after asking the questions, you went back to the

14  precinct?

15  A.      Yes, sir.

16  Q.      Made a photo array?

17  A.      Yes, sir.

18  Q.      And you stated that you compiled the pictures.  How

19  did you compile the pictures?

20  A.      With the information that we had on a Joe Brittman

21  [sic] after looking him up in our system, in our database, we

22  found his information matching up to what we thought we had.

23  Q.      Okay.  And --

24  A.      So we might have had the right person, might not, it's

25  just one of them things you take what you have.

1  Q.      And how did you include the fillers in that photo

2   array?

3  A.      The fillers.  Just a description of what we had from

4   him.

5  Q.      Okay.  And --

6  A.      And after we saw the photo, once we pulled up his

7   information and saw the photo, we matched him up to what we

8   had as well.

9  Q.      So you're saying the description of Mr. Brittman or

10  Mr. Edwards?

11 A.      Mr. Brittman -- I mean, I'm sorry, Mr. Edwards.

12  Mr. Edwards.

13 Q.      After compiling this photo array, you started to head

14  back to the hospital, but Mr. Brittman had already been

15  discharged; correct?

16 A.      Right.  We got back to the hospital and looked for

17  him, they said he had just left, he had just got discharged.

18 Q.      And from that point you proceeded over to his

19  residence; correct?

20 A.      Exactly.

21 Q.      Okay.  And you stated that he was just pulling up when

22  you had arrived?

23 A.      Yes, sir, probably about 30 seconds after we got

24  there -- before we got there.

25 Q.      He had just pulled up right before you had arrived.

1  A.      Yes, sir.

2  Q.      And who was he with?

3  A.      He was with a friend that was -- I guess a friend had

4  picked him up from the hospital and drove him back home.

5  Q.      Do you know that friend's name?

6  A.      No, sir.

7  Q.      And at some point you started talking to Mr. Brittman

8  about the photo array?

9  A.      Yes, sir.

10 Q.      Was that inside or outside of the residence?

11 A.      Outside.

12 Q.      Outside of the residence?

13 A.      Yes.

14 Q.      So Mr. Brittman was sitting in the vehicle?

15 A.      He was outside the vehicle.

16 Q.      He was outside the vehicle --

17 A.      Yes, sir.

18 Q.      -- he had came in?

19 A.      Yes, sir.  When we pulled up, he had just got outside

20 the vehicle and was walking around.

21 Q.      And he came to your vehicle, or did you go to his?

22 A.      We stayed at his vehicle.  Once he saw us pulling up,

23 he just stopped towards the end of the vehicle he got out of,

24 towards the trunk.

25 Q.      Describe for me, Detective, how you showed

1   Mr. Brittman the photo array.

2   A.      I told him, I said, Mr. Brittman, we have a photo

3   lineup.  But first, before we show it to you, I need you to

4   view this photo lineup Advice of Rights.  And it explained

5   the reasons for the photo lineup.  He signed it.  Then I

6   showed him the photo lineup and he went right to -- I think

7   it was spot number two, circled it, initialed off on it.  And

8   then I told him, you need to write down at the bottom what

9   did he do to you.  And he wrote the statement that he made

10  and signed off on it.

11          Flipped it back over to the Advice of Rights.  He put

12  in -- he initialed off, I did identify this person in spot

13  number two.

14  Q.      And this was done by yourself and Detective Coffer at

15  the time?

16  A.      Yes, sir.

17  Q.      Okay.  Was any other officers on the scene?

18  A.      No, sir.

19  Q.      And the only two people who were there for

20  Mr. Brittman was himself and the friend?

21  A.      Yes, sir.

22  Q.      And where was the friend when you were looking through

23  this -- when he was looking at the photo array?

24  A.      By the time -- he was in the vehicle at first.  Then

25  by the time we were done, he was already outside the vehicle

*TESTIMONY OF OFFICER TUBORIS MARTIN*                    30

1   walking back up towards the house.

2   Q.      Okay.  Do you know if at any point before Mr. Brittman

3   made his identification, did Detective Coffer say anything to

4   Mr. Brittman?

5   A.      No, sir.

6   Q.      I want to go back just for a second, back to

7   Mr. Brittman's statement earlier at the hospital.

8           So Mr. Brittman stated that him and Mr. Edwards had

9   some type of beef but he didn't know what it was about;

10  correct?

11  A.      I believe so.

12  Q.      And he didn't tell you -- he didn't give you the name

13  of anyone else that may know what the beef was about;

14  correct?

15  A.      Not to my knowledge, no, sir.  He was very specific

16  and almost to the point of being upset or irate in naming Roy

17  Edwards.

18  Q.      Did he tell you how he knew Mr. Edwards?

19  A.      I'm sure he did, but I can't recall.  I can't recall

20  that part, just to be honest with you.

21  Q.      So -- and I guess you're not sure if he told -- one

22  second.

23          Mr. Brittman didn't reside in the residence that he

24  was shot in front of, did he?

25  A.      No.

1   Q.      He said he was going over there to view -- to get his

2   car repaired; correct?

3   A.      Yes, sir.  It was something -- something inside, I

4   believe.  It was some sort of repair that apparently they do

5   at the house.

6   Q.      And did he tell you that he was going to meet a friend

7   over there by the name of Sasha?

8   A.      I do not recall, no.

9               MR. NKRUMAH:  One second, Your Honor, please.

10                       (Short pause.)

11  BY MR. NKRUMAH:

12  Q.      And he didn't say -- and did Mr. Brittman say if

13  anyone was outside as he was pulling up to the residence?

14  A.      The only part I remember, sir, is he said as he was

15  pulling up, that's when he say Roy walking over to him and

16  started firing shots at him and he pulled right on back off.

17  Q.      So he didn't -- you don't recall if he told you the

18  person whose house he was going to was outside waiting for

19  him?

20  A.      Not to my knowledge.  I cannot remember that.

21  Q.      You don't call him stating that there were -- the

22  neighbors were outside at the time of the shooting?

23  A.      No, sir.

24  Q.      Okay.  So he couldn't tell you -- he couldn't give you

25  the name of anyone who had possibly witnessed this shooting,

1   did he?

2                   THE COURT:  Besides himself?

3                   MR. NKRUMAH:  Besides himself, correct.

4                   THE WITNESS:  I don't think so.

5   BY MR. NKRUMAH:

6   Q.      Now, this shooting occurred in the early part of the

7   afternoon, didn't it?

8   A.      About 1:30, something like that, yes, sir.

9   Q.      1:30 in the afternoon?

10  A.      Roughly.

11  Q.      And it was daylight during that time?

12  A.      Yes.

13  Q.      It wasn't raining, correct, to your knowledge, if you

14  remember?

15  A.      I don't think so.

16  Q.      Clear day; right?

17  A.      I think it was more overcast.

18  Q.      But visibility was not a problem; correct?

19  A.      No, no.

20  Q.      And he informed you that after being shot he

21  immediately drove away; correct?

22  A.      Yes.

23  Q.      And where did he drive to, do you remember?

24  A.      I think he went to somebody else's house and they went

25  to the hospital.  That person took him to the hospital.

1   Q.      When you got to the hospital, did you observe anyone

2   there with Mr. Brittman?

3   A.      No.

4   Q.      Did Mr. Brittman tell you that anyone was there with

5   him?

6   A.      No.

7   Q.      Did you speak to anyone else, other than Mr. Brittman,

8   at the hospital?

9   A.      Other than nurses, no.

10  Q.      If you know, was it Mr. Brittman who called 911 or was

11  it someone else?

12  A.      I couldn't tell you.  I don't have that knowledge.

13  Q.      And you stated that the interview of Mr. Brittman at

14  the hospital was recorded on your body cam; correct?

15  A.      Yes.

16  Q.      Okay.  Now, you stated after getting the photo array

17  identification from Mr. Brittman, you went back over to the

18  scene of the incident; correct?

19  A.      Yes.

20  Q.      And you testified that you went back over there to do

21  some further information?

22  A.      Yes, sir.  Met the other investigators that made the

23  scene while we went to the hospital.

24  Q.      Okay.  And you and those investigators canvassed the

25  area for video; correct?

1   A.      Yes.

2   Q.      And you also canvassed the area for other witnesses;

3   correct?

4   A.      Exactly.

5   Q.      Now, you stated that Mr. Brittman identified the house

6   to you; correct?

7   A.      Yes.  By a car being in the -- I guess, in the front

8   yard.

9   Q.      And you were able to locate that house when you made

10  the scene; correct?

11  A.      Yes.

12  Q.      And did you interview anyone that may have been in

13  that house?

14  A.      No, sir.  From my understanding, investigators went to

15  knock on doors and they didn't get a response at that door.

16  Q.      Okay.  How about the homes next door, did the -- did

17  you or any of the other investigators interview anyone from

18  the homes next door to those homes?

19  A.      I believe, sir, the investigators that made the scene

20  over there first, I don't think they made contact with

21  anybody.

22  Q.      So, to your understanding, the investigators didn't

23  speak to anyone regarding this alleged incident; correct?

24  A.      My knowledge, yes, sir.

25  Q.      Okay.

1              MR. NKRUMAH:  Could I have one second,

2   Your Honor?

3              THE COURT:  Go ahead.

4              MR. NKRUMAH:  One moment, Your Honor.

5              THE COURT:  Sure.

6                    (Short pause.)

7              MR. NKRUMAH:  Thank you.

8              THE COURT:  Yes, sir.

9   BY MR. NKRUMAH:

10  Q.     Sergeant Martin, just a couple more questions.

11         After canvassing the scene, did you speak with

12  Mr. Brittman further any time that day, March 18th?

13  A.     No, sir.  After he viewed the photo lineup, that was

14  it.  No more conversation with him.

15  Q.     Did Mr. Brittman tell you when he first noticed Mr. --

16  allegedly noticed Mr. Edwards approaching his vehicle?

17  A.     He said as he was pulling up, he saw Edwards

18  approaching him, and immediately he started opening fire on

19  him.  And that's when he pulled back off.

20         And from the way the video looked, that matched up

21  with what he was saying.

22             MR. NKRUMAH:  No further questions, Your Honor.

23             THE COURT:  Any redirect?

24             MR. OLDHAM:  Briefly, Your Honor.

25                      REDIRECT EXAMINATION

*TESTIMONY OF OFFICER TUBORIS MARTIN*                    36

1   BY MR. OLDHAM:

2   Q.      Sergeant Martin, Mr. Nkrumah asked you some questions

3   about what Mr. Brittman said and what other officers did out

4   there around Sunrise.  Did you produce a report -- or a

5   supplement right during or right after this investigation?

6   A.      Yes, sir.

7   Q.      If you reviewed that supplement, would you be able to

8   answer those questions more clearly?

9   A.      Yes, sir.

10             MR. OLDHAM:  Your Honor, may I approach with this

11   real quick?

12             THE COURT:  Yes, sir.

13             THE WITNESS:  Okay.  1327 hours.  I was --

14   BY MR. OLDHAM:

15   Q.      Just read to yourself.  Okay?

16   A.      Oh, okay.

17   Q.      And then once you're done reading, let me know.

18   A.      Okay.  (Reviewing document.)

19   Q.      Did that help you remember?

20   A.      Yes, sir.

21   Q.      Did Mr. Edwards tell you who he was looking -- or who

22   he spoke to out there where he pulled up to get work at

23   3135 -- I mean, over on Sunrise?

24   A.      Yes, he did say he was going to his friend Sasha's

25   house to get work done on his vehicle.

1  Q.      Okay.  And that was at 3067 Sunrise; is that correct?

2  A.      Yes.

3  Q.      And were other officers able to locate anybody out

4  there when they went to investigate?

5  A.      No.

6  Q.      Did they specifically go to 3058 Sunrise, which was

7  Sasha's residence and knock?

8  A.      Yes.

9  Q.      Were they able to locate anybody?

10 A.      No.

11 Q.      Okay.  Did that help you to remember the things that

12 Mr. Nkrumah had asked earlier?

13 A.      Yes.

14             MR. OLDHAM:  No further questions, Your Honor.

15             THE COURT:  All right.  Thank you, Sergeant

16 Martin.  You may step down.  Thank you, sir.

17             MR. OLDHAM:  May Sergeant Martin be excused,

18 Your Honor?

19             THE COURT:  Yes, sir, unless he's under subpoena

20 from somebody else.

21             MR. OLDHAM:  I don't believe so.

22             THE COURT:  Mr. Nkrumah?

23             MR. NKRUMAH:  No, Your Honor.

24             THE COURT:  Okay.

25                 (Whereupon, witness excused.)

1            MR. OLDHAM:  The Government calls Officer

2    Mendoza, Your Honor.

3         (Whereupon, Officer Ryan Mendoza duly sworn.)

4            THE WITNESS:  Yes, sir.

5            THE COURT:  You may proceed.

6            MR. OLDHAM:  Thank you, Your Honor.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          *   *   *

2                     OFFICER RYAN MENDOZA,

3    was called as a witness and having first been duly sworn

4    testified as follows:

5                          DIRECT EXAMINATION

6    BY MR. OLDHAM:

7    Q.      Good afternoon.

8    A.      Good afternoon.

9    Q.      Would you state and spell your first and last name,

10   please.

11   A.      Ryan, R-Y-A-N.  Last name, M-E-N-D-O-Z-A.

12   Q.      You kind of speak softly, so if you could lean into

13   the microphone a little bit and speak up.

14   A.      Okay.

15   Q.      Where are you employed?

16   A.      Memphis Police Department.

17              THE COURT:  Is that mic on?

18              COURT REPORTER:  No.

19              THE COURT:  I don't think the mic's on.  Every

20   time, no matter what we do.

21   BY MR. OLDHAM:

22   Q.      All right.  Would you state and spell your first and

23   last name.

24   A.      Ryan, R-Y-A-N.

25              THE COURT:  All right.  Is the switch on?  Try it

1     again.

2     BY MR. OLDHAM:

3     Q.      State your first and last name and spell them, please.

4     A.      Ryan Mendoza.  First name, R-Y-A-N.  Last name,

5     M-E-N-D-O-Z-A.

6     Q.      Where are you employed?

7     A.      Memphis Police Department.

8     Q.      Where are you assigned?

9     A.      Austin Peay Station.

10    Q.      What do you do at Austin Peay Station?

11    A.      Work for the task force.

12    Q.      And what does the task force do at the Austin Peay

13    Station with the Memphis Police Department?

14    A.      We have -- we work closely with the GIB.  And they

15    have individuals go look for their -- related to certain

16    incidents.  And they help us go out there and locate the

17    individuals.

18    Q.      Okay.  And on March 19th, were you asked to locate

19    someone?

20    A.      Yes, sir.

21    Q.      And who were you asked to locate?

22    A.      Roy Edwards.

23    Q.      And what was your understanding about Mr. Edwards?

24    A.      That he was responsible for an aggravated assault the

25    prior day, for the prior day.

1  Q.      The prior day?

2  A.      Yes.

3  Q.      And were you and the rest of your task force officers

4  able to locate Mr. Edwards?

5  A.      Yes, sir.

6  Q.      Could you explain to the Court the process of how

7  y'all identified and then found Mr. Edwards.

8  A.      How we identified, we went into the area where the

9  shooting happened, and where he has a last known address for

10  his residence.  And we -- while I was driving around, I

11  located an individual that resembled Mr. Edwards.  I was in a

12  marked police vehicle.  And then we had an unmarked vehicle

13  in the area so I asked the officer, Officer Martin, to come

14  by and verify if it's him.

15  Q.      Okay.  So let's stop for a second.  You're the first

16  person who saw this individual; is that correct?

17  A.      Yes.

18  Q.      And you asked somebody to verify who could get closer;

19  is that correct?

20  A.      Yes.

21  Q.      And why did you think he could get closer?

22  A.      Because he was in a vehicle that wasn't marked that

23  said Memphis Police on it.

24  Q.      Okay.  And who did you ask to do that?

25  A.      Officer Mark Martin.

1   Q.      Okay.  Now, that's not the sergeant who just

2   testified, is it?

3   A.      No, sir.

4   Q.      It's a different officer; correct?

5   A.      Yes, sir.

6   Q.      Was Officer Martin able to identify Mr. Edwards?

7   A.      Yes, sir.

8   Q.      And where did he tell you that he went?

9   A.      He observed him walking Benjestown.  I want to say

10  close to Marrs.  And he followed him to a small convenience

11  store at the location of Benjestown and Whitney.

12  Q.      Okay.  What are you saying?

13  A.      He observed him walking down the street and walking to

14  a store located at Benjestown and Whitney.

15  Q.      Okay.  Spell what you just said.

16              THE COURT:  The intersection.

17              THE WITNESS:  Oh, Benjestown.

18              THE COURT:  Are you saying Benjitown?

19              THE WITNESS:  Benjestown.

20  BY MR. OLDHAM:

21  Q.      And Whitney?

22  A.      Yes.

23  Q.      Okay.  So it's at that intersection and Whitney, and

24  the address ended up being 692 Whitney; is that correct?

25  A.      Yes, sir.

*TESTIMONY OF OFFICER RYAN MENDOZA*                    43

1   Q.     And it was a little convenience store; is that

2   correct?

3   A.     Yes, sir.

4   Q.     Who went into the convenience store to find

5   Mr. Edwards?

6   A.     Officer Moore and myself.

7   Q.     Who was the first person to get to Mr. Edwards?

8   A.     Officer Moore.

9   Q.     Was Officer Moore able to take him into custody?

10  A.     No.  He -- Mr. Edwards began to struggle with her.

11  Q.     Did you help?

12  A.     Yes, sir.

13  Q.     During -- did he immediately go into custody once you

14  started to help?

15  A.     No, sir.

16  Q.     Did the struggle continue?

17  A.     Yes, sir.

18  Q.     During the struggle, did you feel anything?

19  A.     Yes, sir.

20  Q.     And what did you feel?

21  A.     Felt the handgun in the front pocket in his

22  sweatshirt.

23  Q.     And where was Mr. Edwards trying to put his hands?

24  A.     Inside the pocket of the sweatshirt.

25  Q.     Was anybody else there who participated in this, I

1    guess, scuffle while y'all are trying to take him into

2    custody?

3    A.      Yes.

4    Q.      And who was that?

5    A.      It would be Mr. Edwards' sister.

6    Q.      And what did she do during this interaction?

7    A.      She kept interfering during the interaction.  And she

8    ended up taking the gun from the pocket and placing it

9    elsewhere in the store.

10   Q.      During the interaction were you able to tell what she

11   had done, or did you learn about that later?

12   A.      Learned about that later.

13   Q.      And what first made you know that the gun wasn't

14   there?

15   A.      When Mr. Edwards was placed into custody, and went to

16   go retrieve gun, and it was not in the pocket.

17   Q.      And what did you do to try to find out what happened

18   to the gun?

19   A.      Went to the clerk of the store to review the cameras.

20   Q.      And were you able to review the cameras?

21   A.      Yes, sir.

22   Q.      Were those cameras eventually downloaded, the video?

23   A.      Yes, sir.

24   Q.      And did the video show what had happened with

25   Mr. Edwards' sister?

1   A.      Yes, sir.

2   Q.      And what happened?

3   A.      Showed her getting involved in the incident and taking

4   the handgun and placing it behind one of the stands in the

5   store.

6   Q.      Okay.  And were you there when somebody recovered

7   something from that little stand in the store?

8   A.      Yes, sir.

9   Q.      And what was recovered?

10  A.      A handgun.

11  Q.      Do you see the person that you took into custody today

12  in the courtroom?

13  A.      Yes, sir.

14  Q.      And would you point him out and tell us something he's

15  wearing, please.

16  A.      Tan top.  (Indicating.)

17          MR. OLDHAM:  Okay.  Your Honor, may the record

18  reflect he's identified the defendant.

19          MR. NKRUMAH:  No objection.

20          THE COURT:  The record will reflect that he's

21  identified the defendant, Roy Edwards.

22          MR. OLDHAM:  Thank you, Your Honor.

23          THE COURT:  Yes, sir.

24  BY MR. OLDHAM:

25  Q.      You were eventually able to get Mr. Edwards into

1    custody; is that correct?

2    A.      Yes, sir.

3    Q.      And where was he taken after he was placed in custody?

4    A.      Taken to Austin Peay GIB.

5    Q.      And was that to be interviewed in connection with the

6    shooting?

7    A.      Yes, sir.

8    Q.      Was he eventually arrested by the Memphis Police

9    Department?

10   A.      Yes, sir.

11   Q.      And who did that?

12   A.      That would be Sergeant Martin.

13   Q.      Was he transported as well?

14   A.      Yes, sir.

15   Q.      Who transported him?

16   A.      That, I don't recall who transported him.

17   Q.      But he was arrested after he went to Austin Peay that

18   day?

19   A.      Yes, sir.

20              MR. OLDHAM:  Your Honor, if the Court will

21   allow --

22              THE COURT:  Are you asking was he charged after

23   he went to Austin Peay?

24   BY MR. OLDHAM:

25   Q.      Was he charged with a crime after he went to Austin

1    Peay?

2    A.      Yes, sir.

3    Q.      Okay.  And did y'all have a crime that he had

4    committed there on the scene that day?

5    A.      Yes, sir.

6    Q.      And what crime had he committed there on the scene

7    that day?

8    A.      Convicted felon in possession of a handgun.

9    Q.      But that's not why you were looking for him, was it?

10   A.      No, sir.

11   Q.      Why were y'all looking for him?

12   A.      For the aggravated assault that happened the day

13   prior.

14              MR. OLDHAM:  Your Honor, the Government made

15   Attachment A to our brief.  Could we show that to the officer

16   now?

17              THE COURT:  That's fine with me.  Any objection?

18              MR. NKRUMAH:  No, Your Honor.

19              THE COURT:  All right.  So why don't we mark the

20   disk -- well, or we'll just note for the record that the

21   Government has attached a CD as Exhibit A to their memorandum

22   in response to the motion to suppress.

23              And that's the video that you're showing now.

24              MR. OLDHAM:  Exact copy, Your Honor, that the

25   defense has --

1            THE COURT:  Yes, sir.

2            MR. OLDHAM:  -- and that the Court has.

3            THE COURT:  Yes, sir.

4            MR. NKRUMAH:  Your Honor?

5            THE COURT:  Yes, sir.

6            MR. NKRUMAH:  May we approach briefly?

7            THE COURT:  Do we have to or -- sure.

8            MR. NKRUMAH:  Well, Your Honor, I can ask from

9    here.

10       (Sidebar conference out of hearing of the jury.)

11            MR. NKRUMAH:  I just wanted to take a moment, a

12   restroom break --

13            THE COURT:  Oh --

14            MR. NKRUMAH:  -- before we play the video.

15            THE COURT:  -- that's fine.  Okay.

16            (Sidebar conference concluded.)

17            THE COURT:  We're going to take short recess for

18   a comfort break and then we'll come back.

19            Officer Mendoza, please don't speak to anybody

20   about your testimony.

21            We'll be in recess for a few minutes.

22            CASE MANAGER:  All rise.  This Court stands in

23   recess.

24     (Recess was had at 2:37 p.m. and resumed at 2:46 p.m.)

25            THE COURT:  Are we ready?

*TESTIMONY OF OFFICER RYAN MENDOZA*                    49

1           MR. OLDHAM:  Judge, the video played before we

2     took our break and now it won't play.  I shut it off and

3     turned it back on.  I apologize.

4           THE COURT:  Apparently you've got time anyway, we

5     don't have a defendant.

6      (Whereupon, defendant returned to the courtroom 2:46 p.m.)

7           THE COURT:  Yes, sir, would you take the stand

8     again.

9           We are back on the record.

10           Officer Mendoza, you are still under oath.

11           And whenever you're ready, Mr. Oldham, with the

12    video.

13           MR. OLDHAM:  Thank you, Your Honor.

14           Your Honor, I don't know what happened.  I had it

15    on the computer and it had already played.  I don't know why

16    it quit playing and now I don't know why the computer can't

17    start so...

18           The new ones don't have disk drives so we have to

19    put it on to our actual device.

20           THE COURT:  I understand.

21           MR. OLDHAM:  Okay.  Your Honor, sorry about that.

22           THE COURT:  All right.  You may proceed.

23           MR. OLDHAM:  Thank you.

24              (Whereupon, video played.)

25    BY MR. OLDHAM:

1   Q.      Officer, have you seen this video before?

2   A.      Yes, sir.

3   Q.      And who are the people on the screen right now?

4   A.      Mr. Edwards and his sister.

5   Q.      Okay.  And who's going to enter here in a second?

6   A.      Officer Moore and myself.

7   Q.      All right.  I'm going to stop it.  The video time is

8   14:39:37.

9           Who is in the top of the view right there?

10  A.      Me.

11  Q.      Who's at the top of the screen?

12  A.      Me.

13  Q.      Okay.  Beyond that, the other three people.

14  A.      Beyond that, it's Officer Moore, Mr. Edwards, and his

15  sister.

16  Q.      Okay.  And what are you about to do?

17  A.      Assist in taking him into custody.

18                     (Whereupon, video played.)

19  BY MR. OLDHAM:

20  Q.      Okay.  I'm going to stop it again at 14:40:05.  It's

21  kind of obscured.  Why haven't y'all got him in custody yet?

22  A.      We can't get his hands behind his back.

23  Q.      Okay.  And have y'all told this person to move back,

24  the sister?

25  A.      I don't recall --

*TESTIMONY OF OFFICER RYAN MENDOZA*                    51

1          MR. NKRUMAH:  Objection, Your Honor.  Leading.

2          THE WITNESS:  -- what all we said during that

3   time.

4          MR. NKRUMAH:  Objection.  Leading.

5          THE COURT:  I'm not sure that was leading, but

6   don't lead.

7          MR. OLDHAM:  Thank you, Judge.

8   BY MR. OLDHAM:

9   Q.    Is it normal to have another person, besides the

10  person you're trying to arrest, involved in the arrest?

11  A.    No, it's not normal.

12  Q.    Okay.  Is this a safe situation or an unsafe

13  situation?

14  A.    Unsafe situation.

15              (Whereupon, video played.)

16  BY MR. OLDHAM:

17  Q.    All right.  I'm going to stop here at 14:31:36.

18        What did you feel during the struggle?

19  A.    A handgun.

20  Q.    And do you feel it now?

21  A.    No.

22  Q.    Is that what you're looking for?

23  A.    Yes, sir.

24              (Whereupon, video played.)

25  BY MR. OLDHAM:

*TESTIMONY OF OFFICER RYAN MENDOZA*                    52

1   Q.      At 14:42:28 are you taking him out to put him in a
2   cruiser?
3   A.      Yes, sir.
4   Q.      And then who watched the video?
5   A.      I went back and reviewed the video.
6   Q.      Were you able to tell officers where that individual
7   went from the cooler over to the ATM right there?
8   A.      Yes.
9   Q.      Okay.  And did that conclude your interaction with
10  Mr. Edwards at that time?
11  A.      Yes.
12              MR. OLDHAM:  Thank you for answering my
13  questions.  Please answer defense counsel's questions.
14              Your Honor, I pass the witness.
15              THE COURT:  All right.  Cross-examination?
16              MR. NKRUMAH:  May I inquire, Your Honor?
17              THE COURT:  Of course.
18                      CROSS-EXAMINATION
19  BY MR. NKRUMAH:
20  Q.      Good afternoon, Officer Mendoza, how you doing this
21  afternoon?
22  A.      Pretty good.
23  Q.      My name is Kafahni Nkrumah and I'm the attorney for
24  Mr. Roy Edwards.  I'm going to ask you some questions
25  regarding his arrest on March 19th.  Understand?

1  A.      Yes, sir.

2  Q.      Okay.  If I ask you a question that you don't

3  understand, you'll let me know; correct?

4  A.      Yes, sir.

5  Q.      And if you answer the question, I can assume and

6  everyone can assume that you understood it; right?

7  A.      Yes, sir.

8  Q.      When were you notified that Mr. Edwards was wanted in

9  connection with a shooting?

10 A.      In the morning of this incident.

11 Q.      The morning of the incident or the morning of the

12 arrest?

13 A.      The morning of the arrest.

14 Q.      And that was March the 19th?

15 A.      Yes, sir.

16 Q.      And was that at the morning briefing?

17 A.      Yes, sir.

18 Q.      And who conducted this morning briefing?

19 A.      Officer Redding.

20 Q.      Officer who?

21 A.      Redding.

22 Q.      Okay.  And Officer Redding, what was the information

23 that Officer Redding relayed to you in the briefing regarding

24 Mr. Edwards?

25 A.      That he was involved in the aggravated assault

1  incident the day prior and that he was developed as a

2  suspect.

3  Q.    At that time was there a warrant out for Mr. Edwards'

4  arrest in regards to this incident?

5  A.    No, sir.

6  Q.    Were you advised that he was wanted for questioning or

7  for arrest?

8  A.    Well, they had enough to arrest him.

9  Q.    So he was wanted for arrest for the shooting at that

10 time.

11 A.    Yes, sir.

12 Q.    Okay.  Now, you stated that you were the first officer

13 to observe my client?

14 A.    Yes, sir.

15 Q.    And where were you exactly when you observed

16 Mr. Edwards?

17 A.    I was on Juliet, close to Morningside.

18 Q.    Juliet to Morningside?

19 A.    Yes, sir.

20 Q.    And you stated that you were in a marked cruiser;

21 correct?

22 A.    Yes, sir.

23 Q.    Were you the driver or the passenger?

24 A.    Driver.

25 Q.    And where was Mr. Edwards when you noticed him?

1  A.      I don't know what address.  It was in the road on

2  Juliet.

3  Q.      He was in the road?

4  A.      Yes.

5  Q.      So was he on the side of you when you noticed him, was

6  he in front of you, was he behind you?

7  A.      I mean, when I noticed him, I drove past him.

8  Q.      And you drove past him?

9  A.      Yes.

10  Q.      After driving past my client, what did you do next?

11  A.      I couldn't verify it was him, so I called for

12  Mr. Martin, who was in an unmarked unit.

13  Q.      You said you couldn't verify that it was him?

14  A.      No.

15  Q.      So at that time you weren't able to identify

16  Mr. Edwards; correct?

17  A.      Correct.

18  Q.      And you contacted another officer?

19  A.      Yes.

20  Q.      In an unmarked vehicle?

21  A.      Yes.

22  Q.      And where was that officer located?

23  A.      He was in the area, in the same area I was, around

24  Morningside area, Morningside/Juliet area.

25  Q.      Okay.  And how long after you notified the officer did

*TESTIMONY OF OFFICER RYAN MENDOZA*                          56

1    the officer come back and tell you that that in fact was

2    Mr. Edwards?

3    A.        Couple of minutes.  He had to do a couple -- had to do

4    a couple of drive-bys because he started walking.  He left

5    the original location and was walking down the road.  So he

6    made a couple of pass-bys and he was able to identify him.

7    Q.        After being notified that that in fact was

8    Mr. Edwards, what did you do next?

9    A.        We called for our partners to assist -- called for our

10   partners to come into the area, while Officer Martin kept

11   eyes on him, to assist in taking him into custody.

12   Q.        Now, where was Officer Martin's vehicle at this time,

13   do you know?

14   A.        I believe he was on Benjestown at that time.

15   Q.        Was he mobile or was he parked?

16   A.        I can't tell you that.

17   Q.        Did he inform you of which direction Mr. Edwards was

18   traveling?

19   A.        Yes.

20   Q.        And what direction was that, Officer?

21   A.        It would be southbound on Benjestown.

22   Q.        So he was southbound on where?

23            THE COURT:  Would you mind, be sure to keep your

24   voice up so that we can all hear it.

25            THE WITNESS:  Yes, sir.

1                    THE COURT:  He was headed southbound?

2                    THE WITNESS:  Yes, sir.

3    BY MR. NKRUMAH:

4    Q.      On what street, I'm sorry?

5    A.      Benjestown.

6    Q.      Benjestown?

7    A.      Yes.

8    Q.      And at what point did you again pick up Mr. Edwards?

9    A.      Officer Martin watched him walk into the store.

10   Q.      So Officer Martin observed him go into the store.

11   A.      Um-hmm.

12   Q.      Okay.  And with -- your partner was Officer Moore;

13   correct?

14   A.      No, I was in a one-man unit that day.

15   Q.      You were in a one-man unit.  Okay.

16           So Officer Martin radioed that he observed Mr. Edwards

17   go into the store?

18   A.      Yes, sir.

19   Q.      And after radioing that Mr. Edwards went into the

20   store, what happened at that point?

21   A.      Myself, Officer Redding, Officer Moore, and Officer

22   Martin pulled up to the store to take Mr. Edwards into

23   custody.

24   Q.      And were you all in one-man vehicles?

25   A.      No, sir.

1    Q.      Just yourself?

2    A.      Myself and Martin.

3    Q.      Yourself and Officer Martin.

4    A.      Yes, sir.

5    Q.      Officer Moore had a partner?

6    A.      Yes.  Officer Redding.

7    Q.      Officer Redding?

8    A.      Yes, sir.

9    Q.      Was Officer Moore the driver or the recorder in that

10   vehicle?

11   A.      The passenger.

12   Q.      Okay.  So it was Officer Moore who entered the store

13   first; correct?

14   A.      Yes, sir.

15   Q.      And you came in after Officer Moore?

16   A.      Yes, sir.

17   Q.      And then Officer Redding at some point?

18   A.      Officer Redding came in after I did, later on.

19   Q.      And Officer Moore was the first officer to make

20   contact with Mr. Edwards; correct?

21   A.      Yes, sir.

22   Q.      And that was at the back of the store?

23   A.      Yes, sir.

24   Q.      And were you able to see when Officer Moore first made

25   contact with Mr. Edwards?

*TESTIMONY OF OFFICER RYAN MENDOZA*                    59

1   A.      Yes, sir.

2   Q.      And when Officer Moore made contact with Mr. Edwards,

3   she immediately grabbed his left arm, didn't she?

4   A.      I don't recall which arm she grabbed.

5   Q.      But you noticed that Officer Moore grabbed Mr. Edwards

6   when she got to the back of the store; correct?

7   A.      Yes, sir.

8   Q.      And in grabbing Mr. Edwards, she took control over him

9   at that time, didn't she?

10  A.      Yes, sir.

11  Q.      And she placed his arm behind his back, didn't she?

12  A.      Yes, sir.

13  Q.      And she placed him up against the cooler where -- the

14  beverage cooler, in the back area, in the corner of the

15  store; correct?

16  A.      Yes, sir.

17  Q.      And after placing him at the -- against the cooler,

18  she proceeded to grab his other arm and place it behind his

19  back; correct?

20  A.      Yes, sir.

21  Q.      And at that time Mr. Edwards wasn't trying to escape;

22  right?

23  A.      He began to resist.

24          THE COURT:  Can I -- is the mic on?

25          THE WITNESS:  (Indicating.)  Yes, sir.

UNREDACTED TRANSCRIPT

1              THE COURT:  All right.  Just checking.  Thank

2   you.

3   BY MR. NKRUMAH:

4   Q.      Now, you stated that he began to resist.  How did he

5   resist?

6   A.      He's not allowing Officer Moore to put his hands in

7   handcuffs.

8   Q.      But at this time Officer Moore didn't have her

9   handcuffs yet, did she?

10  A.      I believe she had the handcuffs in her hand.

11  Q.      And at some point she was able to take her handcuffs

12  out of her -- she was able to take her handcuffs out;

13  correct?

14  A.      Yes, sir.

15  Q.      You didn't take them out for her, did you?

16  A.      No, sir.

17  Q.      You didn't give her your handcuffs, did you?

18  A.      No, sir.

19  Q.      She took her handcuffs out; correct?

20  A.      Yes, sir.

21  Q.      And she did this while she was holding onto

22  Mr. Edwards; correct?

23  A.      Yes, sir.

24  Q.      And Mr. Edwards was standing right there, wasn't he?

25  A.      At the cooler?

1   Q.      Mr. Edwards was standing beside Officer Moore when she

2   took her handcuffs out, wasn't he?

3   A.      Yes, sir.

4   Q.      In fact, she had him pinned up against the cooler at

5   that time; correct?

6   A.      Yes, sir.

7   Q.      And she was able to take her handcuffs out; correct?

8   A.      Yes, sir.

9   Q.      Now, at this time you were standing next to

10  Officer Moore and Mr. Edwards; correct?

11  A.      At that time?  No.

12  Q.      When did you come upon the scene?

13  A.      When I noticed there was a struggle, where she

14  couldn't get him into handcuffs.

15  Q.      But when you first came upon the scene -- okay.  You

16  stated that you noted that there was a struggle.  But when

17  you first came upon the scene, you didn't intercede, did you?

18  A.      Initially, no, I didn't.

19  Q.      And you stopped and you watched what was going on

20  between Officer Moore and Mr. Edwards; correct?

21  A.      Yes, sir.

22  Q.      And at some point during this -- during what was going

23  on between Officer Moore and Mr. Edwards, Ms. Edwards, his

24  sister, interjected herself in this scene; correct?

25  A.      Yes, sir.

1   Q.      And at that time Ms. Edwards was trying to notify the

2   officers, you included, that her brother had just had

3   surgery, wasn't she?

4                   MR. OLDHAM:  Objection.  Hearsay, Your Honor.

5                   THE COURT:  Well, yeah, I guess, Mr. Nkrumah, I'm

6   giving you a fair amount of latitude here.  I just -- I want

7   to make sure that we're clear on what the issue in front of

8   the Court is.  And I just don't -- I don't want to -- I mean,

9   well, first of all, I think the objection is well founded.

10  I'm not sure what -- (A) what the relevance is, and (B) what

11  the exception to the hearsay rule would be, Mr. Nkrumah, as

12  to what the sister was saying.

13                  MR. NKRUMAH:  Your Honor, I'm not offering the

14  sister's statement as proof of the statement being made, I'm

15  just -- I'm offering the question to get Mr. Mendoza's

16  reaction as to why he reacted the way that he reacted in the

17  video.

18                  Also, Your Honor, on direct the Government went

19  into the entire arrest of Mr. Edwards, and also -- this

20  witness also testified that Mr. Edwards had been resisting

21  arrest.  So I asked --

22                  THE COURT:  So you're saying that you're not

23  offering it for the truth of the matter asserted, just that

24  she said it.

25                  MR. NKRUMAH:  That's correct.

1          THE COURT:  All right.  But let's just remember

2   what the issue is, and -- so I'll allow it.  But let's focus

3   on what we're -- you know, what the issue is, which is, you

4   know, whether the arrest -- I think --

5          MR. NKRUMAH:  Had probable cause.

6          THE COURT:  -- whether there was probable cause

7   for the arrest.  But you can go ahead and ask the question.

8          MR. NKRUMAH:  Thank you, Your Honor.

9   BY MR. NKRUMAH:

10  Q.     Officer Mendoza, at the point when Ms. Edwards

11  interjected into the scuffle, she was trying to inform you

12  that my client had just had -- recently had surgery; correct?

13  A.     I don't recall what she said about surgery.

14  Q.     And at some point she exited from the struggle;

15  correct?

16  A.     Yes.

17  Q.     Now, you stated that you -- that at some point during

18  the struggle you felt a weapon; correct?

19  A.     Yes, sir.

20  Q.     Now, during that time Ms. Edwards was also involved in

21  the struggle; correct?

22  A.     Yes, sir.

23  Q.     And at some point you were able to place Mr. Edwards

24  into custody; correct?

25  A.     Yes, sir.

1  Q.      And at any time, other than stating that you felt what

2  you thought was -- what appeared to be a firearm, did you

3  actually see a firearm?

4  A.      No, I did not.

5  Q.      Did any of the other officers see a firearm at that

6  time?

7  A.      No.

8  Q.      And when -- after he was handcuffed and searched, no

9  firearm was found; correct?

10 A.      Not on him.

11 Q.      You didn't find a firearm in the area where the

12 struggle had ensued, did you?

13 A.      No.

14 Q.      That's what you were looking for when we saw you in

15 the video?

16 A.      Yes, sir.

17 Q.      At some point you stated that you reviewed the video;

18 correct?

19 A.      Yes, sir.

20 Q.      And that video was from the store; correct?

21 A.      Yes, sir.

22 Q.      Okay.  Were you wearing a body camera that day?

23 A.      Yes, sir.

24 Q.      Did you record any of this on body camera?

25 A.      Yes, sir.

1  Q.      Do you know if any of the other officers recorded it

2  on body camera?

3  A.      Yes, sir.

4  Q.      Now, you did state, Officer, that at the time you

5  approached Mr. Edwards there was not a warrant for arrest --

6  for his arrest at that time; correct?

7  A.      Correct.

8  Q.      And he was just wanted for questioning?

9  A.      He was wanted regarding the --

10 Q.      Regarding the incident?

11 A.      -- [inaudible].

12          COURT REPORTER:  I'm sorry, I didn't hear your

13 answer.

14          THE WITNESS:  He was developed as a suspect.

15 BY MR. NKRUMAH:

16 Q.      He was developed as a suspect, that was your answer?

17 A.      Yes, sir.

18          MR. NKRUMAH:  Okay.  One moment, Your Honor.

19          THE COURT:  Yes, sir.

20              (Short pause.)

21 BY MR. NKRUMAH:

22 Q.      You testified that Mr. Edwards was transported to

23 Austin Peay Station.

24 A.      Yes, sir.

25 Q.      Was he transported anyplace else before going to

1  Austin Peay, do you know?

2  A.      Not that I recall.

3  Q.      You didn't question Mr. Edwards at any point during

4  this altercation, did you, Officer?

5  A.      No, sir.

6  Q.      Do you know if any other officer questioned

7  Mr. Edwards?

8  A.      No, sir.

9  Q.      It was simply an arrest; correct?

10  A.      Yes, sir.

11          MR. NKRUMAH:  No further questions, Your Honor.

12          THE COURT:  Redirect?

13          MR. OLDHAM:  No, Your Honor.

14          THE COURT:  All right.  Officer Mendoza, thank

15  you.  You're excused.  If you wouldn't mind handing that --

16  thank you.

17          MR. OLDHAM:  May Officer Mendoza be excused,

18  Your Honor?

19          THE COURT:  Yes, sir.

20             (Whereupon, witness excused.)

21          MR. OLDHAM:  Officer Martin, Your Honor.

22      (Whereupon, Officer Mark Martin was duly sworn.)

23          THE WITNESS:  I swear.

24          THE COURT:  We're using the jury box as the

25  witness chair.

*TESTIMONY OF OFFICER MARK MARTIN*                           67

 1              THE WITNESS:  Yes, sir.

 2              THE COURT:  There you go.

 3                        *   *   *

 4                   OFFICER MARK MARTIN,

 5   was called as a witness and having first been duly sworn

 6   testified as follows:

 7                     DIRECT EXAMINATION

 8   BY MR. OLDHAM:

 9   Q.      Good afternoon.

10   A.      Hey, how you doing?

11   Q.      You've got to speak up.  The mask kind of muffles

12   everything, and that mic's not picking up a lot so...

13   A.      Can you hear me better now?

14              THE COURT:  Yes, sir, we sure can.  Thank you.

15   BY MR. OLDHAM:

16   Q.      Would you state and spell your first and last name.

17   A.      Yes.  My name is Mark Martin.  That's M-A-R-K,

18   M-A-R-T-I-N.

19   Q.      Where are you employed?

20   A.      With the Memphis Police Department.

21   Q.      Where are you assigned?

22   A.      At the time it was at Austin Peay Task Force.

23   Q.      Where are you now?

24   A.      At OCU on the CAT team.

25   Q.      Okay.  And when you were assigned in March of 2021 to

1   the Austin Peay Task Force, what were your duties?

2   A.      As a task force officer, we would work with GIB.  GIB

3   would give us people to go pick up or assignments to do.  And

4   if GIB didn't have anything for us to do, then we'd make

5   traffic stops or try to pick up warrants.

6   Q.      On the day in question, what were you asked to do as a

7   member of the Austin Peay Task Force?

8   A.      The day before there was an aggravated assault, where

9   a gentleman was shot.  And Roy Edwards was produced as a

10  suspect, so GIB asked us if we could search the area and see

11  if we could find Mr. Edwards.

12  Q.      And what were you to do when you found him?

13  A.      To bring him to GIB.

14  Q.      So arrest him and bring him to GIB; is that correct?

15  A.      Yes, sir.

16  Q.      And what did you and the task force do in order to try

17  to find Mr. Edwards?

18  A.      We went in the area.  Officer Mendoza was in a marked

19  squad car and I was in an unmarked car, and we started

20  driving around the area of Morningside.  When Officer Mendoza

21  was driving around and saw who he appeared -- he thought it

22  was Roy Edwards, but he couldn't tell, so he called me in

23  with the unmarked car.  So we were driving the area and I

24  made a few pass-bys to verify that it was him.

25  Q.      Were you able to do that?

1  A.      Yes, sir.

2  Q.      What did you do once you verified it was him?

3  A.      We saw him walk into a store at Whitney and

4  Benjestown.  And at that point I contacted the other

5  officers, Officer Redding and Moore on our task force.  And

6  when he went into the store, I got them to go into the store

7  to verify.  Officer Moore and Officer Mendoza went into the

8  store to visually 100 percent verify, because I was 99

9  percent sure.  Officer Moore went in and verified and at that

10  point I was in the car.

11              THE COURT:  Hold for one second.  Do you know

12  what --

13              MR. OLDHAM:  I'm sorry, Your Honor.  It's my

14  computer.  I apologize.

15              THE COURT:  No, that explains it.  Okay.  Keep

16  going.

17  BY MR. OLDHAM:

18  Q.      So did you tell them where he went in?

19  A.      Yes.  I told them he went into the mini-mart right

20  there at the corner of Whitney and Benjestown.

21  Q.      And who went in after him?

22  A.      Officer Moore went in first.  Officer Redding went to

23  the rear of the business.  And Officer Mendoza went in right

24  after Officer Moore.

25  Q.      And did you eventually enter?

1  A.      Yes, I did.

2  Q.      Once you eventually entered, what did you see when you

3  entered?

4  A.      When I first entered, I saw a female black laying up

5  against -- across from the ATM.  She was, lack of better

6  words, hysterical crying.  And I turned the corner and I saw

7  that they had Roy Edwards, getting him in custody, and

8  patting him down.

9  Q.      And what did you understand that y'all were trying to

10 find once you got in there?

11 A.      A weapon that another officer had felt on him.  A gun,

12 handgun.

13 Q.      And did you go about trying to do that once you

14 entered?

15 A.      Yes, sir.  I started searching the area, once they

16 took him out of -- got him in custody and took him out to the

17 squad car.  Started checking the immediate area, because I

18 didn't know if a gun had fallen out when they were trying to

19 get him in custody.  So I was checking that immediate area of

20 where he was and where his -- the female black that was

21 hysterical was.

22 Q.      Did Officer Mendoza do anything?

23 A.      Yes.  He was also checking the area with me to try to

24 find it.  And then he went and checked the video camera,

25 because we saw that there was a camera pointing right in that

*TESTIMONY OF OFFICER MARK MARTIN*                    71

1    direction.  He went and checked the video and saw where she

2    had walked over behind the ATM and set something back there.

3    At that point, I went back there, shined my flashlight.  And

4    behind the shelf, directly behind the ATM, there was a black

5    handgun with an extended magazine.

6    Q.    So you were the person who located it; is that

7    correct?

8    A.    Yes, sir.

9              MR. OLDHAM:  Your Honor, if I could approach with

10   a series of three photographs.

11             THE COURT:  Yes, sir.

12   BY MR. OLDHAM:

13   Q.    (Tendered.)

14   A.    (Reviewing photos.)

15   Q.    Did you recognize those?

16   A.    Yes, sir.

17   Q.    Is that the firearm?

18   A.    Yes, sir.

19             MR. OLDHAM:  Your Honor, if I make this the next

20   numbered exhibit to this hearing.

21             THE COURT:  It's a photograph of the firearm?

22             MR. OLDHAM:  It's a photograph inside and then

23   two of a closer-up version of this, once it was taken out

24   from where it was.

25             THE COURT:  All right.  Okay.  These three

1   photographs will be admitted as a collective exhibit.  We'll

2   call it Exhibit 2.

3            MR. OLDHAM:  Thank you, Your Honor.

4        (Collective Exhibit No. 2 admitted into evidence.)

5            MR. OLDHAM:  May I publish, Your Honor?

6            THE COURT:  Yes, sir.

7   BY MR. OLDHAM:

8   Q.     Officer, what does this show?

9   A.     That shows where I located the black handgun with the

10  extended magazine that was located behind the ATM, directly

11  behind the ATM, behind a shelf.

12  Q.     And then this is the same handgun, just pulled out; is

13  that correct?

14  A.     Yes, sir.

15  Q.     And, again, I think it's trying to show the serial

16  number; is that correct?

17  A.     Yes, sir.

18  Q.     That's a Taurus 9MM; is that correct?

19  A.     Yes, sir.

20            MR. OLDHAM:  Your Honor, if I could, I'm going to

21  jump ahead on the video.  If I could publish the video to

22  Officer Martin.  And just his part of locating -- what I

23  think shows him locating, if that's okay.  We're going to

24  start at time stamp 14:47:10.

25            THE COURT:  14:47 what?

1          MR. OLDHAM:  14:47 -- it jumped ahead, now it's

2   21, Your Honor.

3          THE COURT:  Okay.

4              (Whereupon, video played.)

5   BY MR. OLDHAM:

6   Q.    And what are you doing right now?

7   A.    Right now I'm just checking any shelves in the area

8   where the female was to see if maybe she placed a gun in the

9   area.

10         THE COURT:  That's you with your back to us?

11         THE WITNESS:  Yes, sir, with the hat on.

12  BY MR. OLDHAM:

13  Q.    All right.  What just happened there at 14:47:45?

14  A.    That's when I located the gun.  Officer Mendoza was

15  watching video footage.  And at that time he told me that she

16  went and bent down behind the ATM.  So I went over there and

17  checked where she had bent down and located the handgun.

18  Q.    And that's when y'all signaled to Officer Mendoza that

19  y'all had located it; is that correct?

20  A.    Yes, sir.

21  Q.    All right.  Who were you asked to find that day?

22  A.    Roy Edwards.

23  Q.    Who did you identify going into the store?

24  A.    Roy Edwards.

25  Q.    And who was arrested that day?

1  A.      Roy Edwards.

2  Q.      Do you see him in the courtroom today?

3  A.      Yes, sir.

4  Q.      Would you point him out and tell us something he's

5  wearing, please.

6  A.      He has the beige jumpsuit on, his hair up, and has a

7  black mask on.

8          MR. OLDHAM:  Your Honor, if the record could

9  reflect that the witness has identified the defendant, Roy

10 Edwards.

11         THE COURT:  The record will reflect that he's

12 identified the defendant, Roy Edwards.

13         MR. OLDHAM:  Thank you, Your Honor.

14 BY MR. OLDHAM:

15 Q.      Someone else collected the gun that day; is that

16 correct?

17 A.      Yes, that is correct.

18 Q.      Okay.

19         MR. OLDHAM:  Okay.  Your Honor, Mr. Nkrumah and I

20 spoke before and he's okay with us just having the photo

21 serve as the gun and not have to make the actual gun an

22 exhibit.

23         THE COURT:  That's fine.

24         MR. OLDHAM:  Thank you, Your Honor.

25         MR. NKRUMAH:  That is correct, Your Honor.

1        THE COURT:  Okay.

2        MR. OLDHAM:  Thank you for answering my

3   questions.  Please answer defense counsel's questions.

4        Your Honor, I pass the witness.

5        THE COURT:  Yes, sir.

6        Cross-examination?

7        MR. NKRUMAH:  Yes, Your Honor.

8        May I inquire, Your Honor?

9        THE COURT:  Yes, sir.

10                    CROSS-EXAMINATION

11   BY MR. NKRUMAH:

12   Q.     Good afternoon, Officer Martin.

13   A.     Hey, how you doing?

14   Q.     My name is Kafahni Nkrumah, I'm the attorney for

15   Mr. Edwards.  I'm going to ask you some questions about the

16   arrest on March 19th.  Okay?

17   A.     Yes, sir.

18   Q.     If you don't understand a question that I ask, please

19   let me know.  Okay?

20   A.     Yes, sir.

21   Q.     Okay.  You stated that you were assigned to the Austin

22   Peay Task Force the morning of the 19th of March of 2021;

23   correct?

24   A.     Yes, sir.

25   Q.     And were you a part of the briefing the task force had

1  that morning?

2  A.       There wasn't a specific briefing.  They had come in --

3  someone had told us that we were looking for Roy Edwards.

4  Q.       So it wasn't a specific briefing, but someone had came

5  in and told you that you were looking for Roy Edwards.

6  A.       Yes, sir.  Every day we get there, it's not a sit-down

7  briefing, but somebody from Task Force will go speak with

8  GIB, and then bring in our duties for the day, who we need to

9  find or --

10 Q.       Do you know who that officer was that particular

11 morning?

12 A.       I do not recall that day.

13 Q.       And what area -- you stated that you were looking in a

14 certain area for Mr. Edwards; correct?

15 A.       Yes, sir.  Down in the area of Morningside/Sunrise

16 area, where the shooting had occurred.

17 Q.       Okay.  And how were you first alerted that Mr. Edwards

18 may be in the area?

19 A.       Oh, we weren't alerted that he was -- I was alerted by

20 Officer Mendoza.  But we were just going in the area to check

21 to see if we could get eyes on him or see if he was walking

22 around.

23 Q.       And Officer Mendoza alerted you on the car radio?

24 A.       Yes, sir.

25 Q.       And what exactly did he say --

1  A.      I don't remember --

2  Q.      -- if you remember?

3  A.      -- word for word, but he just told me that he had a

4  suspect that he believed could be Mr. Edwards.  But being in

5  a marked squad car, the gentleman that he believed was Roy

6  Edwards kept turning his head away when he'd drive by.  So he

7  called for me to come by in an unmarked car.

8  Q.      Did he provide a description of this gentleman?

9  A.      I don't recall at the time.

10  Q.      Did he tell you where the gentleman was located in the

11  area?

12  A.      Yes.  He first saw him at the corner of Juliet and

13  Morningside.

14  Q.      And how far were you from that area when you first

15  received this transmission?

16  A.      I was at Dawn and Frayser, so that's about a quarter

17  of a mile away.

18  Q.      And you proceeded back to the area of --

19  A.      Well, it's all in the same area.

20  Q.      So you just continued --

21  A.      I just circled around and came by him.

22  Q.      So you just circled around and continued your patrol;

23  correct?

24  A.      I specifically drove by to verify to see if that was

25  Roy Edwards, when I drove by, after Officer Mendoza asked me

1    to come check the individual.

2    Q.      Now, you stated that you were able to identify him.

3    A.      Yes.

4    Q.      What was he wearing that day?

5    A.      That day he was wearing a red hoodie.  I'm not sure

6    about the pants.

7    Q.      Did he have the hood up or was it down?

8    A.      He did have the hood up.

9    Q.      Did he have a mask on that day?

10   A.      Not that I recall.

11   Q.      How many times did you have to pass the individual

12   before you decided it was Mr. Edwards?

13   A.      I don't know the exact number, but I would say it was

14   around four or five times.

15   Q.      So you drove by four or five times?

16   A.      In an unmarked car.

17   Q.      Okay.  And that covered how many blocks that

18   Mr. Edwards was walking?

19   A.      I don't recall how many blocks.

20   Q.      But during the time that you were driving by,

21   Mr. Edwards was walking; correct?

22   A.      Yes.

23   Q.      Was he walking with anyone else?

24   A.      Yes.  He was walking with a female black.

25   Q.      Now, you testified that you observed Mr. Edwards enter

1   a store; correct?

2   A.      Yes, sir.

3   Q.      And after observing Mr. Edwards enter the store, what

4   did you do after that?

5   A.      Then I contacted the other members of our task force.

6   Since Officer Mendoza was already in contact with me and we

7   were communicating, I contacted Officer Moore and Officer

8   Redding to come over to the mini-mart to go inside.

9   Q.      And you contacted them to go inside to verify your

10  identification; correct?

11  A.      To verify him and take him into custody by what I had

12  already seen.

13  Q.      Take him into custody if that was in fact him?

14  A.      Yes, sir.

15  Q.      Okay.  When were you notified that your identification

16  was verified?  Was it before you entered the store or after?

17  A.      I don't recall.

18  Q.      Now, you stated that you entered the store.  You

19  entered the store after Officer Moore and Mendoza?

20  A.      Yes, sir.

21  Q.      Okay.  How long after?

22  A.      I don't recall how long after.  Shortly after.

23  Q.      Now, when you entered the store, Mr. Edwards was

24  already in custody?

25  A.      Yes, sir, he was already placed in cuffs and they were

1    patting him down.

2    Q.      And they were patting him.

3            Did you notice a firearm on Mr. Edwards at that time?

4    A.      No, not at that time.

5    Q.      Do you know if a firearm was found on Mr. Edwards at

6    any time?

7    A.      Not to my knowledge on him.

8    Q.      Not on his person.

9    A.      I had nothing to do with finding a firearm on him.

10   Q.      Okay.  Now, at the time that you entered the store,

11   did you notice where his sister was?

12   A.      Well, I didn't know that to be his sister at the time.

13   But after the fact, yes, I saw where she was.

14   Q.      And where was she?

15   A.      She was standing right next to the ATM on one of the

16   Powerball ticket machines, laying her head -- with her head

17   in her hands crying.

18           MR. NKRUMAH:  One second, Your Honor.

19           THE COURT:  Yes, sir.

20                   (Short pause.)

21           MR. NKRUMAH:  No further questions, Your Honor.

22           THE COURT:  All right.  Before you ask any

23   questions, Mr. Oldham, can I ask one question.

24           Officer Martin, you said that when you drove by,

25   you drove by three or four times I guess, and positively

1    identified Mr. Edwards.

2              THE WITNESS:  Yes, sir.

3              THE COURT:  How did you know it was Mr. Edwards?

4              THE WITNESS:  Because I -- before when --

5    whenever they give us anybody to go look for, I do my

6    research and look up photos of them, old booking photos,

7    driver's license photos, anything that I could to make sure I

8    can visually identify.

9              THE COURT:  Okay.

10             All right.  Does that prompt any questions for

11   you, Mr. Nkrumah?

12   BY MR. NKRUMAH:

13   Q.    Officer Martin, at the time of your identification of

14   Mr. Edwards, did you have those photos with you?

15   A.    I with my -- what we call our PDA, the

16   department-issued phone, and I had his driver's license photo

17   pulled up.

18   Q.    And were you the recorder or driver in the vehicle at

19   the time?

20   A.    I was the only person in the unmarked vehicle.  I was

21   the driver.

22   Q.    So when you identified Mr. Edwards, were you driving

23   or were you -- were you driving when you identified

24   Mr. Edwards?

25   A.    At different times.  That's why I made several passes,

1   because I wanted to be a hundred percent sure that who I was

2   seeing walking down the street was the same person I saw in

3   that picture.

4   Q.      So the entire time you were driving when you were

5   making these identifications; correct?

6   A.      Yes, sir.

7   Q.      You had not stopped the vehicle at any time; correct?

8   A.      I was driving very slowly past him.

9   Q.      And you were driving slow so you could get a better

10  look at the person?

11  A.      Yes, sir.  That's why I made several passes, because I

12  didn't want to make a mistake on who the identification was.

13              MR. NKRUMAH:  No further questions, Your Honor.

14              THE COURT:  All right.  Redirect?

15              MR. OLDHAM:  No, Your Honor.  Thank you.

16              THE COURT:  All right.  Officer Martin, thank

17  you, sir.

18              MR. OLDHAM:  May he be excused, Your Honor?

19              THE COURT:  Yes.

20                  (Whereupon, witness excused.)

21              MR. OLDHAM:  That's the Government's proof,

22  Your Honor.

23              THE COURT:  All right.  Mr. Nkrumah?

24              MR. NKRUMAH:  No proof, Your Honor.

25              THE COURT:  All right.  I guess we can turn the

UNREDACTED TRANSCRIPT

1    mics off.

2            Mr. Nkrumah, do you want to be heard?

3            MR. NKRUMAH:  Yes, Your Honor.

4            Your Honor, it's our contention that the officers

5    did not have probable cause at the time that Mr. Edwards was

6    seized in the store by Officer Moore and arrested.

7            Your Honor, any arrest, whether normal or

8    de facto, requires probable cause, Centanni versus Eight

9    Unknown Officers, 15 F.3d 587, 592; also, Gardenhire v.

10   Schubert, 205 F.3d 303.

11           THE COURT:  Hold on.  I'm going to give you a

12   microphone.  Or Mr. Knox is anyway.

13           MR. NKRUMAH:  Better, Your Honor?

14           THE COURT:  Yes, sir.

15           MR. NKRUMAH:  Your Honor, it's understandable

16   here in the Sixth Circuit that a victim's identification --

17   or a victim's accusation of a crime standing alone can be

18   sufficient to establish probable cause.  What the Sixth

19   Circuit is usually -- has usually announced that rule in the

20   context of sexual assaults, Your Honor, but we do understand

21   that that rule can also apply to aggravated assaults and

22   other offenses.

23           But the presumption of the veracity applies only

24   where the witness is someone with respect to whom there is no

25   apparent reason to question the person's reliability.  Jerome

1    versus Crum, 695 Fed. Appx. 935, 941.

2              Your Honor, in this case there was reason to

3    question Mr. Bitman's [sic] statement given in response to

4    this aggravated assault.  To begin with, Your Honor,

5    Mr. Bitman [sic] could not identify the address of the

6    shooting, even though he did give a description of the house

7    and it was eventually located by the officer, despite this

8    being a friend's residence that he was allegedly going to.

9              His reasons, Your Honor, when questioned by the

10   officer, by Sergeant Martin, during Sergeant Martin's

11   investigation, the reason that he gave for the shooting was

12   that he knew that they had a beef, but he doesn't know why --

13   what the beef was actually about.

14             There was no corroboration of Mr. Bitman's

15   statement.  There were no witnesses able to corroborate the

16   incident, including the friend that he had went to see.  No

17   one spoke to the officers to corroborate Mr. Bitman's

18   statements.

19             And sometimes, Your Honor, rivals, as it appears

20   Mr. Bitman and Mr. Edwards may have been, enlist the help of

21   the police to eliminate their rivals by accusing them of

22   false allegations or accusing them of allegations they know

23   that they didn't commit in order for the police contact to

24   ensue.

25             Based on the statement that was given by

1    Mr. Bitman, Your Honor, even though he was speaking to

2    Memphis Police Department officers and it was recorded,

3    Mr. -- there's no testimony from anyone, including

4    Sergeant Martin that an Affidavit of Complaint was actually

5    signed on the 18th or the 19th by Mr. Bitman.  An Affidavit

6    of Complaint being signed by Mr. Bitman, Your Honor, would

7    have turned Mr. Bitman's alleged statement into a more

8    reliable statement.  And the fact that signed statements,

9    Your Honor, against the penalty of perjury of law carry

10   greater weight.

11             THE COURT:  Can you check your mic.

12             MR. NKRUMAH:  Carries greater weight.

13             THE COURT:  I don't think it's -- is it on?

14             CASE MANAGER:  It's on.

15             THE COURT:  It doesn't sound like it.

16             MR. NKRUMAH:  It just died.

17             THE COURT:  It's par for the course.  That's all

18   there is to it.

19             If you would, just yell, will you.

20             MR. NKRUMAH:  Your Honor, the fact that

21   Mr. Bitman's statement was not -- the fact that Mr. Bitman

22   did not give a signed statement on the 18th or the 19th or no

23   testimony was introduced that he had -- we attest,

24   Your Honor, goes towards the reliability of the statement.

25             As I stated a moment ago, a signed statement, a

1    signed Affidavit of Complaint by Mr. Bitman would have shored

2    up the reliability because of the penalties of perjury

3    associated with the signing.

4            Because no statement was signed, and no formal

5    complaint at that time was made by Mr. Bitman, the fact that

6    there were no corroborating witnesses to the events, the fact

7    that at the time Mr. Edwards was arrested there had been no

8    corroboration by video, no corroboration by any other method

9    to corroborate Mr. Bitman's story.

10           And, again, Your Honor, because of the fact that

11   Mr. Bitman hedged on explaining to the officers what the beef

12   between him and Mr. Edwards was about, the officer did not --

13   was not able to testify as to how Mr. Bitman was familiar

14   with Mr. Edwards in order to point him out, was not able

15   to -- the fact that Mr. Bitman was also not able to identify

16   the residence, even though it belonged to a friend of his who

17   he had been allegedly going to see about fixing his vehicle,

18   the fact that Mr. Bitman, Your Honor, drove off without

19   contacting authorities afterwards, all of these facts,

20   Your Honor, would have led a reasonable prudent officer to

21   conduct further investigation.

22           We do understand, Your Honor, that in this

23   district there is no -- there is no requirement that officers

24   conduct further investigation, unless there are reasons that

25   lead to further verifying information that they've received.

1    In this case, Your Honor, we state that there was further

2    verification needed, based on the spotty information given by

3    Mr. Bitman.  The only information given by Mr. Bitman was the

4    fact that he identified Mr. Edwards as the shooter, which was

5    never corroborated, and that was it.  And his injuries, Your

6    Honor, which it's not contested that Mr. Bitman was in fact

7    injured in a shooting.

8                THE COURT:  One second, Your Honor.

9                THE COURT:  Yes, sir.

10               MR. NKRUMAH:  For all those reasons, Your Honor,

11   we state that the weapon that was found, for all those

12   reasons, Your Honor, we state that not only did Officer

13   Martin at the time of Mr. Edwards' arrest not have

14   probable -- sufficient probable cause in order to place

15   Mr. Edwards under arrest -- maybe, Your Honor, sufficient

16   probable cause to continue an investigation by questioning,

17   but not probable cause to place him under arrest.  Which

18   entailed -- implies that the officers who actually arrested

19   Mr. Edwards, even though they were notified by fellow

20   officers, did not have sufficient probable cause to make an

21   arrest of Mr. Edwards.

22               Under the Terry doctrine, Your Honor, we imply

23   that the officers had a right to question further

24   Mr. Edwards, but not place him under arrest.

25               It is clear from the video, Your Honor, that was

1   shown by the prosecution in this case, that Mr. Edwards was

2   immediately placed under arrest, was not questioned by

3   Officer Moore when first approached.  It's clear that

4   Officer Moore took control and seized Mr. Edwards at first

5   contact at the back of the store, by placing the first arm

6   that she was able to grab behind his back, placing the second

7   arm behind his back, able to take her handcuffs out of her

8   handcuff case and attempt to handcuff Mr. Edwards.

9          At that time, Your Honor, is when Mr. Edwards'

10  sister intervened and then the other officer intervened into

11  the scuffle.  Before that, Your Honor, the other officer was

12  standing, observing Officer Moore place Mr. Edwards, who was

13  not resisting, was not -- and was complying with the

14  directions, was complying with Officer Moore's nonverbal

15  directions of placing his hands behind his back, and leaving

16  his hands behind his back in order for Officer Moore to take

17  her handcuffs out, while still in control of my client, who

18  did not attempt to leave the area or the scene.

19         For all those reasons, Your Honor, we ask that

20  the weapon that was found, the firearm that was found at 692

21  Whitney, be suppressed because the officers did not have

22  probable cause to arrest Mr. Edwards at that time.  Thank

23  you.

24              THE COURT:  Thank you, Mr. Nkrumah.

25              Mr. Oldham?

1          MR. OLDHAM:  Yes, Your Honor.

2          First, Your Honor, defense counsel never said

3    that Mr. Edwards possessed the gun.  He implied that maybe

4    the sister -- through his questioning, maybe the sister had

5    the gun.  He never said, my client had a gun and the police

6    couldn't search him and so the gun should be suppressed.  If

7    he's not even saying that he has possessory interest in the

8    gun, then he doesn't have standing to file this motion in the

9    first place.

10          Next, on the area of standing, once Mr. Edwards

11   allows his sister to take the gun out of his pocket and go

12   hide it, they've abandoned it there by the ATM.  Again, not

13   having standing to say that this should be suppressed.

14          But the actual issue I want to focus on is the

15   fact that there was probable cause, Your Honor.  Defense made

16   a naked accusation of Mr. Bitman having some sort of vendetta

17   against the person who shot him, saying that they were rivals

18   and he may have said something about him because they're

19   rivals.  There's no proof.

20          I think the statement was from the officer that

21   Mr. Bitman told him that they had a beef.  And there's no

22   other indication that there's anything else going on, other

23   than him saying that we had a beef.  Mr. Bitman was able to

24   tell the police where he was.  He didn't know the actual

25   physical address, but he did tell the police where he was.

1          Also, he did leave the scene, but I think the

2    Court would be allowed to infer that he left the scene

3    because someone was actively shooting him at the scene, and

4    he wanted to get away from the person shooting him before

5    they did further damage, and to call the police.  I'm sure if

6    he could have called a timeout during the shooting to call

7    the police, he would have.  But I don't think he had that

8    option.

9          The defense also recommends to the Court that

10   there's two levels of probable cause, one for questioning and

11   one for arrest.  The Government would submit that once

12   probable cause is formed, there may be an arrest.

13         The officer, the investigator, Sergeant Martin,

14   relied on something in this case, Your Honor.  And he does

15   have a signed statement.  He showed me.  This Roy Edwards,

16   Dirty Shirt.  Joe Bitman.

17         Your Honor, that's a statement enough for there

18   to be probable cause in this case.  That is a written

19   statement of identification of someone who shot him.

20         So then an officer of the law has to ask, what is

21   the motivation of my witness?  And the motivation is to tell

22   him who just shot him, not days later when he's had a chance

23   to say who's my rival and I'm not going to tell him the right

24   person, I'm going to tell him the person I don't like, and

25   I'm just going to let the person who shot me in the hand run

UNREDACTED TRANSCRIPT

1    free.

2            The officers did what they could.  They went back

3    out to the scene.  They knocked on doors.  Nobody gave them a

4    statement.  They pulled a video showing that the shooting

5    actually happened, and they talked to the victim and said,

6    who shot you?  And he said, Roy Edwards.  And this is just a

7    matter of hours after he had been shot.

8            This isn't a beyond a reasonable doubt, but the

9    Government submits that if we presented this to a jury they

10   could find that he was shot beyond a reasonable doubt.  This

11   is a probable cause standard, Your Honor, and there was

12   probable cause to believe that Roy Edwards shot Mr. Bitman

13   that day.

14           The next day, task force officers can say wanted

15   for questioning, we need to arrest him.  They wanted him

16   brought in.  I don't think that the words they used matter.

17   They knew that they were supposed to go out and arrest

18   somebody, because they had probable cause to believe that he

19   had shot somebody the day before.

20           The officers met that person in the store.  I

21   would submit there was some resisting.  If not, I don't know

22   what the one-minute wrestling match was.  If Mr. Edwards went

23   straight into custody, I don't know why they all did whatever

24   they did there for a minute if there was no resisting.  And I

25   think it's clear what happened after that, and where they

1   found the gun.

2          So the Government would ask, respectfully, for

3   you to overrule the motion and allow us to move forward with

4   the evidence.

5          THE COURT:  All right.  Mr. Nkrumah, you want the

6   last word?

7          MR. NKRUMAH:  Briefly, Your Honor.

8          Your Honor, in response to the Government's

9   argument, on the issue of abandonment, Your Honor, we would

10   contend that the legal police conduct necessitates the

11   abandonment issue being taken out of the equation.  And that

12   there was no abandonment because of the illegal police

13   contact, Your Honor.

14          As far as probable cause for --

15          THE COURT:  I might be able to stop you there.

16   Let me just say this.  If the arrest itself was illegal --

17          MR. NKRUMAH:  Yes, that's correct, Your Honor.

18          THE COURT:  The officer felt a gun during that

19   encounter, or what he thought was a gun, and that's what led

20   them to stick around and look for what appears to be the

21   sister putting behind the ATM machine.  So, to me, I tend to

22   agree with you that abandonment would not necessarily come

23   into play.  But that means if the original arrest was

24   unlawful.

25          MR. NKRUMAH:  Your Honor, again, we do believe

1  that the original arrest was unlawful.

2          The circled picture, Your Honor, the circled

3  photo array with the statement at the bottom of the photo

4  array, Your Honor, was not made under the threat of perjury,

5  Your Honor.  It's not an affidavit for complaint that would

6  be observed by an officer of the Court, a judge or a

7  magistrate making probable cause determination, Your Honor.

8  And just because Mr. Bitman pointed out Mr. Edwards in photo

9  array, again, Your Honor, it doesn't -- it does not take his

10 statement to that level of reliability that's needed for

11 probable cause to be attained in this matter.

12         Again, Your Honor, we submit that Officer Martin,

13 based on his interview with Mr. Bitman, did not have

14 sufficient probable cause to have Mr. Edwards arrested.  And

15 we ask that this Court grant Mr. Edwards' motion to suppress.

16         THE COURT:  Well, I'm going to -- the only reason

17 I'm not going to rule right now is because I've got a call in

18 five minutes.  I would recommend that y'all get ready for

19 trial.  And I'm going to probably going to get with Mr. Knox

20 and find a day either next week or the week after and have

21 you back and we'll rule on the motion.

22         I appreciate your time, and we'll talk to y'all

23 again probably in the next, I'm saying, week to ten days.

24 Okay.

25         MR. NKRUMAH:  Thank you, Your Honor.

1          THE COURT:  Thank y'all.  Hearing concluded.

2          (Adjournment at 3:58 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **C E R T I F I C A T E**

2

3

4          **I, CATHERINE J. PHILLIPS, Fellow of the Academy of**

5     **Professional Reporters, Registered Merit Reporter, Certified**

6     **Manager of Reporting Services, do hereby certify that the**

7     **foregoing 94 pages are, to the best of my knowledge, skill,**

8     **and abilities, a true and accurate transcript from my**

9     **stenotype notes of the MOTION TO SUPPRESS on the 8th day of**

10    **September, 2021, in the matter of:**

11

12

13    **UNITED STATES Of AMERICA**

14    **vs.**

15    **ROY EDWARDS**

16

17    **Dated this 8th day of October, 2021.**

18

19    **S/ CATHERINE J. PHILLIPS, FAPR, RMR, CMRS**
      **Official Court Reporter**
20    **United States District Court**
      **Western District of Tennessee**
21

22

23

24

25